THE PEOPLE OF THE STATE OF NEW YORK ex rel. ANNE I. D. HARRIS, Relator, against COMMISSIONER OF WELFARE OF THE CITY OF NEW YORK et al., Defendants.

Supreme Court, Special Term, New York County, February 19, 1947.

*Abraham A. Katz* and *Djalma S. Wolfson* for relator.

*Charles E. Murphy, Corporation Counsel* (*David S. Rosenberg of counsel*), for Commissioner of Welfare, respondent.

*John McKim Minton* for Spence-Chapin Adoption Service, respondent.

WALTER, J. By writing dated July 29, 1946, relator, Anne Isabelle Davidson Harris, an intelligent and educated woman, twenty-eight years of age, unconditionally surrendered her infant daughter, Stephanie Ann Burris, born October 19, 1939, to the Commissioner of Welfare of the City of New York for the purpose of placing such child in a foster home for adoption, and authorized the commissioner to transfer the custody of the child for placement for adoption to an authorized agency as defined in article VII of the Domestic Relations Law, and granted to such agency full power to consent to the adoption of the child without notice to relator.

The commissioner almost immediately transferred the infant to Spence-Chapin Adoption Service, which is such an authorized agency, and it immediately placed the child with a family with a view to adoption of the child by such family.

By this writ relator now seeks to regain custody of the child.

When Stephanie was born, relator was living with her father in Tuxedo Park, New York, although Willard Burris, father of the child, to whom relator was married on July 23, 1937, was still living and it does not appear that he had abandoned or deserted her.

In August, 1941, Burris obtained a divorce from relator in this State, and on December 7, 1941, relator married Alvin Hill, who died on May 4, 1944. Of relator's marriage to Hill there was born another girl, Frances, on January 24, 1943, and Frances was let out for adoption and has been adopted.

On August 26, 1945, relator married Arnold Harris, with whom she was living on July 29, 1946, and with whom she is still living. It does not appear that any children have been born to them.

The writing by which relator surrendered Stephanie to the Commissioner of Welfare contains the recital that after due consideration relator has come to the conclusion that the best interests of the child will be promoted by her being placed in a foster home for adoption.

Relator testifies that when she signed that paper she was given to understand that she would have a period of several months within which to change her mind. I am satisfied, however, that no such representation was made to her; and I strongly suspect that what she now thinks was her then thought upon that subject is merely the product of statements of her present counsel, based upon what I regard as his erroneous construction of section 112 of the Domestic Relations Law as giving a parent a period of six months within which to disaffirm such a surrender.

Relator also testifies that when she married Harris in August, 1945, he was a bachelor of thirty-four, had been but recently discharged from the Army, was in poor health, and was having difficulty in readjusting himself to civilian life, and that in July, 1946, she and her husband were having a rather hard time financially. There is no evidence, however, that they were anywhere near such destitution that with reasonable personal sacrifices they could not adequately care for a six-year-old girl.

Relator's act in signing the paper of July 29, 1946, was not a sudden impulse. On the contrary, on repeated occasions over a period of about nine months immediately prior to that date, she had urged the Department of Welfare to find a place for the child and had talked to various social workers in the depart-

ment about having the child adopted and what adoption actually means. Her husband also talked to at least one of those workers, and there is testimony by one of them, which he has not denied, that he said that when he married relator he understood that both her children already had been adopted.

The surrender of infants by their natural parents and the placing of them in private homes with a view to adoption in the way in which it was done in this case-is expressly authorized by statute (Social Welfare Law, §§ 371, 374, 383, 384; Domestic Relations Law, §§ 109–113; *Matter of Presler,* 171 Misc. 559).

Whether or not a parent's voluntary surrender of a child constitutes an abandonment of the child such as under section 111 of the Domestic Relations Law will dispense with the necessity for the parent's consent to a subsequent adoption has been the subject of rather considerable inconclusive discussion (*Matter of Cohen,* 155 Misc. 202; *Matter of Anonymous,* 178 Misc. 142; *Matter of Davidson,* 44 N. Y. S. 2d 763; *People ex rel. Hausler* v. *Stegmeier,* 267 N. Y. S. 428, revd. 240 App. Div. 901), but none of those cases involved a surrender to an authorized agency. Decision upon that precise point is not here necessary and it hence should be left open for consideration by the court to which application for adoption hereafter may be made.

But whatever ultimately is decided upon that point it seems to me to be clear: First, that the provision in subdivision 7 of section 112 of the Domestic Relations Law that, with exceptions not here material, no order of adoption shall be made until the child has resided with the foster parents for at least six months, does not make the natural parent's surrender of the child conditional or subject to revocation within six months; and, second, that while such a surrender doubtless may be revoked for facts and upon grounds which would lead a court to revoke any kind of a contract (see *Matter of Zimmerman* v. *Cohen,* 236 N. Y. 15, 20) it is not revocable at the will or upon the mere whim or caprice of the parent or merely because the parent has experienced a change of mind or heart.

Such a surrender is a tremendously important act under any circumstances; it is an act which inevitably influences the child's life by the very fact of its being done; it is an act upon which the Department of Welfare, the adoption agencies, and the intended foster parents all rely; and it would be subversive of the welfare of each of them and of a considerable portion of the public, and to a large extent destructive of the processes by which adoptions are accomplished, if the surrender were to be treated as tentative or as revocable at will or upon mere whim.

The facts that within a few months after making the surrender relator sought to see the child and to send her a Christmas present, and that she brought this proceeding within six months after the surrender, thus give her no special standing here and in no way restore to her the natural rights which she surrendered. They are at most merely circumstances to be considered as a guide to discretion.

On the other hand, the fact that the surrender was made and the fact that the agency obtained possession of the child and placed it with a family with a view to adoption, do not prevent the court from giving the child back to the mother if convinced that under all the circumstances that course is proper.

By virtue of its general equitable jurisdiction, this court may order and direct as to the custody and control of infants within the State, and may exercise its jurisdiction to do so either upon writ of habeas corpus or upon petition (*Finlay* v. *Finlay,* 240 N. Y. 429, 432). In all such cases, the guiding principle, the paramount and controlling consideration, is the welfare of the child (*People ex rel. Sisson* v. *Sisson,* 271 N. Y. 285, 287; *Matter of Lee,* 220 N. Y. 532, 538; *People ex rel. Pruyne* v. *Walts,* 122 N. Y. 238, 242; *People ex rel. Sternberger* v. *Sternberger,* 12 App. Div. 398; *Matter of Rich* v. *Kaminsky,* 254 App. Div. 6; *Matter of Meyer,* 156 App. Div. 174, 176; *Matter of Gustow,* 220 N. Y. 373, 377; *People ex rel. Glendening* v. *Glendening,* 259 App. Div. 384, 393, affd. 284 N. Y. 598), and to achieve that welfare the court may take the infant from a parent or legal guardian (*People ex rel. Pruyne* v. *Walts, supra; Wilcox* v. *Wilcox,* 14 N. Y. 575; *Matter of Lee, supra*), from a charitable agency or a welfare commissioner (*People ex rel. Our Lady of Victory I. Home* v. *Venniro,* 126 Misc. 135; *People ex rel. Converse* v. *Derrick,* 146 Misc. 73), and even from one to whom the court itself has committed such custody (*Matter of Knowack,* 158 N. Y. 482; *People ex rel. Terman* v. *Terman,* 267 App. Div. 173, 174), or one to whom another court of competent jurisdiction has awarded custody (*People ex rel. Allen* v. *Allen,* 105 N. Y. 628; *People ex rel. Reisner* v. *New York N. & C. Hospital,* 230 N. Y. 119; *Matter of Stewart,* 77 Misc. 524; *Matter of Standish,* 197 App. Div. 176, affd. 233 N. Y. 689).

Of course that does not mean that the court may take a child from unoffending natural parents and give it to someone else merely because the court may think that the child's temporal welfare would be thereby improved (*Matter of Livingston,* 151 App. Div. 1, 7; *Matter of Cohen,* 155 Misc. 202, 206, *supra*). But

where a father had consented to the appointment of another person as guardian of his infant child and he thereafter sought to vacate the appointment and have himself appointed it was held that his position as father and his ability to support the child and his fitness to have custody were not sufficient to warrant a granting of the relief he requested, and that the burden rested upon him of alleging and establishing that the interest of the infant would be promoted by the appointment of a guardian other than the one theretofore appointed (*Matter of Gustow*, 220 N. Y. 373, 378, *supra*).

A fortiori, when a mother knowingly and understandingly surrenders her child to an authorized agency to be placed out for adoption, and her act is not induced by fraud or mistake, she may not thereafter come into court and, upon a mere assertion that she now wants the child and is able and fit to care for it, have the child given back to her. To get that relief she must show by convincing evidence that the child is in circumstances which compel the conviction that its welfare requires that the court undo what she has done.

No such showing has been made here. It has not even been attempted. On the contrary, it appears without dispute that the child is now in a comfortable home in a suburb of New York City with a married couple still under middle age, educated and intelligent, who have a five-and-a-half-year-old boy of their own and who love this child and are giving her affection as well as education and material comforts as well as some of the luxuries of life, and who wish to adopt her for their own. The child appears healthy, well cared for, and happy. I am convinced that no good to the child or anyone else could come from taking the child from where she is now.

The writ is accordingly dismissed.